IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION


MARTHA E. MIRACLE OWENS,                  )
                                          )
v.                                        )        No. 2:07-0069
                                          )
MICHAEL J. ASTRUE,                        )
Commissioner of Social Security           )


To:      The Honorable Thomas A. Wiseman, Jr., Senior District Judge



## REPORT AND RECOMMENDATION

The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security, denying her Disability Insurance Benefits ("DIB") and Supplemental Security Income benefits ("SSI") under the Social Security Act ("the Act").

The case is currently pending on plaintiff's motion for judgment on the administrative record (Docket Entry No. 14), to which defendant has responded (Docket Entry Nos. 19, 23-24).[1] Upon review of these filings and the administrative record, and for the reasons given below, the Court recommends that plaintiff's motion be GRANTED to the extent that the case should be REMANDED with instructions to the ALJ to comply with the explicit instructions of the Court.

---

[1]In accord with the order entered March 3, 2008 (Docket Entry No. 22), the defendant's motion for summary judgment and accompanying memorandum (Docket Nos. 23-24) are deemed to be defendant's response to plaintiff's motion for judgment on the administrative record.

1

# I. INTRODUCTION

The plaintiff has been seeking disability benefits for over a decade. Her pursuit of benefits has resulted in several administrative decisions and district court opinions, as well as administrative and court remands. This appeal concerns only the August 2, 2007, decision of the Administrative Law Judge ("ALJ"), denying benefits, this Court's order of remand entered March 30, 2006, and the Appeals Council's June 7, 2006, order of remand.

The plaintiff filed her initial DIB application on December 10, 1995. (Tr. 26-28.) Her claim was denied on December 19, 1995 (Tr. 29-47), and she did not pursue that application further.

On April 22, 2008,[2] the plaintiff filed subsequent applications for DIB and SSI, alleging disabling conditions of pain in her back, neck, and hips, with an alleged onset date of August 19, 1996. (Tr. 137-139, 150, 458-460.) Her applications were denied initially (Tr. 113-117) and upon reconsideration (Tr. 120-121.)

On October 15, 1998, the plaintiff filed a timely request for a hearing before an ALJ (Tr. 122), and on April 26, 1999, the plaintiff appeared at an administrative hearing before ALJ Harry Nichol. (Tr. 472-479.) However, because the file was misplaced, the ALJ continued the hearing. (Tr. 472-479.) The hearing was rescheduled to June 29, 1999, at which time the plaintiff and Dorothy Edwards, a vocational expert ("VE"), testified. (Tr. 480-518.)

The ALJ issued an unfavorable decision on September 24, 1999. (Tr. 552-559.) He determined that Plaintiff "ha[d] retained the residual functional capacity to perform a wide range of 'light' work at all times." *Id.* He specifically noted that "[a]lthough State Agency physicians opined that the claimant would be limited to sedentary work activity in August 1998, this is not supported by objective medical findings." (Tr. 557) (internal citations omitted).

_____

[2]The plaintiff incorrectly indicates that her application was filed on April 22, 2996. *See* Docket Entry No. 15, at 2.

The plaintiff sought review by the Appeals Council on October 22, 1999 (Tr. 564), and on July 28, 2000, the Appeals Council denied Plaintiff's request for review. (Tr. 565-566.)

The plaintiff then filed an action in this Court on August 21, 2000, Case No. 2:00-0066. (Tr. 569-570.) By order entered on December 19, 2002, the decision of the ALJ was reversed and remanded, and the ALJ was instructed to fully and fairly develop the record. (Case No. 2:00-0066, Docket Entry Nos. 16 & 17.)

After the case was remanded, another hearing was held on November 17, 2004, before a different ALJ, at which time the plaintiff and Dr. J.D. Flynn, the VE, testified. On April 8, 2005, ALJ Robert Erwin issued an unfavorable decision. (Tr. 527.) He determined that, between August 19, 1996, her alleged onset date, and February 28, 2004, her last date of employment, the plaintiff retained the residual functional capacity ("RFC") to perform light work, lift 20 pounds occasionally and ten pounds frequently, stand and/or walk for six hours in an eight-hour day, and sit for two hours in an eight-hour day, but that she could not climb ropes, ladders, and scaffolds, could not climb ramps and stairs more than occasionally, could not stoop, crouch, crawl, kneel or balance, could not reach overhead with either arm more than occasionally, and could not look overhead more than one-fourth of the day. Thus, the ALJ found that the defendant could–and in fact did–perform her past relevant work during the seven and a half year period. (Tr. 530.)

However, the ALJ also found that the plaintiff's condition had "deteriorated some" since March 1, 2004, when she quit her job, and found that, as of March 1, 2004, she could perform only sedentary work, lift ten pounds, stand and/or walk for six hours in an eight-hour day, thirty minutes at a time, and sit for six hours in an eight-hour day, one hour at a time before taking a brief five-minute rest period, with essentially the same other limitations. *Id.*

The plaintiff sought review by the Appeals Council and, on September 28, 2005, the Appeals Council denied her request for review (Tr. 519-521), thereby rendering that decision the final decision of the Commissioner.

The plaintiff filed a second complaint in this Court on October 20, 2005, Case No. 2:05-0112. On March 30, 2006, upon request of the Commissioner, the Court reversed and remanded the case for a second time for further review, agreeing with the Commissioner that "all essential factual issues have not been resolved." (Tr. 777-785.) Specifically, the Court ordered the Commissioner to (1) "reevaluate Dr. Jain's opinion and obtain additional medical information, if necessary; and (2) reevaluate and provide a comprehensive discussion of Ms. Owen's credibility with reference to the administrative record." (Tr. 777-778.)

On June 7, 2006, the Appeals Council then vacated the April 8, 2005, final decision of the Commissioner, and remanded the case to the ALJ. (Tr. 786.) The Appeals Council explained that the Court had remanded the case to the Commissioner for further administrative proceedings consistent with the Court's order. (Tr. 786-787.) The Appeals Council directed the ALJ to conduct further proceedings consistent with the Appeals Council's order as well as the Court's order. (Tr. 787.)

In its June 7, 2006, order, the Appeals Council recounted the reason given by the ALJ for rejecting the opinions of and limitations prescribed by Dr. Jain, i.e., that Dr. Jain had failed to submit medical treatment records to support his opinion, and pointed out that the record contains reports of approximately 45 examinations conducted by Dr. Jain and his associates during the relevant period. Therefore, the Appeals Council ordered the ALJ to consider those reports, as well as reports by Dr. Joseph Justice. (Tr. 787.) If the ALJ considered Dr. Jain's opinion or the opinion of any treating or examining source to be unsupported, the Appeals Council directed the ALJ to contact the source for additional information. (Tr. 787.)

In addition, the Appeals Council pointed out that the ALJ had found the plaintiff's testimony regarding her limitations to be not totally credible without providing a rationale for that conclusion. *Id.* Thus the Appeals Council found that the ALJ should evaluate the factors he considered and link them to evidence in the record. *Id.*

4

On June 15, 2007, a hearing was held before ALJ Erwin for *de novo* consideration of the plaintiff's claim. (Tr. 884-908.) A VE and a witness for the plaintiff testified at the video conference hearing (Tr. 884-908.) The ALJ began the hearing as follows:

> Now, Ms. Miracle this is a long continued case. See Judge, previous judge in 1999, didn't find in your favor. And the Court sent it back to look at it again. [In] 2005 I didn't find in your favor, and the Court sent it back. And apparently, they want us to continue to re-evaluate this to death. Not really sure why. They don't really state in their decisions. So, we're back here again. We're going to try the best we can with it again.

(Tr. 86.) The ALJ issued an unfavorable decision on August 2, 2007. (Tr. 757-765.)

Thereafter, the plaintiff then filed the instant complaint, her third in this matter, in this Court. The plaintiff claims that, on remand, the ALJ failed to comply with the Appeal Council's order of remand and issued a decision that was not based on substantial evidence. In her complaint, the plaintiff sought an order reversing the Commissioner and awarding benefits beginning on April 22, 1996,[3] or, in the alternative, a remand pursuant to Sentence 6 of 42 U.S.C. § 405(g). It appears that the plaintiff did not really seek--nor does she assert grounds for--a remand under Sentence 6 because in her motion for judgment on the record, she seeks reversal under Sentence 4 of 42 U.S.C. § 405(g), *see* Docket Entry No. 15, at 25, which allows the Court to affirm, modify, or reverse the Commissioner's decision "with or without remanding the case for a rehearing."

---

[3]It is not clear why the plaintiff claims that she is entitled to benefits beginning April 22, 1996, since she states that her onset date is August 19, 1996. *Compare* Docket Entry No. 15, at 2, *with* Docket Entry No. 15, at 25.

5

## II. BACKGROUND

### A. Medical Evidence

The plaintiff was born with a congenital hip disorder. From 1984 to 1994, she experienced increasing pain in both hips, with the more intense pain in the left hip. (Tr. 67.) Dr. William Shell diagnosed her condition as degenerative arthritis of the left hip. *Id.* In April of 1994, a lumbar CT scan revealed that she suffered a mild bulging disc at L-3 and 4. *Id.* On August 31, 1994, Dr. Shell performed a total left hip replacement on the plaintiff. (Tr. 67-71.)

On January 20, 1995, Dr. Verne Allen, a neurosurgeon, saw the plaintiff, who complained of neck pain and radiating left leg pain. (Tr. 89.) According to Dr. Allen, the plaintiff reported that "at times the pain is intense and difficult to tolerate." *Id.* Dr. Allen also observed that the plaintiff "behaves as though she has cervical root compression." *Id.* On January 27, 1995, Dr. Allen noted that test results revealed that the plaintiff had a large disc rupture at C6-7 on the right side. *Id.* Dr. Allen performed a C6-7 right laminectomy on February 1, 1995. (Tr. 81-86.) Dr. Allen noted some disc rupture and some osteophytic spurs. (Tr. 89.) On March 21, 1995, Dr. Allen related that the plaintiff was "doing well" post-operatively and was "not having any arm pain, but [wa]s still having some neck pain." (Tr. 88.)

On November 16, 1995, Dr. Philip Gradolph, a consultative psychiatrist for the Illinois Disability Determination Services, evaluated the plaintiff. (Tr. 102-104.) Dr. Gradolph noted that the plaintiff reported "severe pain in the right hip and down through the leg to the foot when she walks." (Tr. 102.) Dr. Gradolph also related that the plaintiff had suffered from lifelong depression, apparently resulting from having been raped as a child, and that the plaintiff had been hospitalized for two weeks for depression in April 1995. (Tr. 102.) Dr. Gradolph opined that the plaintiff needed additional hip replacement surgery. (Tr. 104.)

Dr. Demetrios Petrovas, a consultative internist for the Illinois Disability Determination Services, also saw the plaintiff on November 16, 1995. (Tr. 105-107.) The plaintiff told

6

Dr. Petrovas that "she now has developed excruciating pain in her right hip with inability to ambulate more than a block without stopping and an inability to go up or down more than on flight of stairs secondary to severe pain." (Tr. 105.) Dr. Petrovas' clinical impression was: "Right Hip Pain. Examination reveals loss of internal rotation to 0 degree and external rotation to 20 degrees. Flexion is 100 degrees with pain. Ambulation is painful. Severe degenerative joint disease of the right hip. Would recommend surgery." (Tr. 107.)

On December 4, 1995, Dr. Young Jo Kim, a non-examining, consultative state agency physician, determined that the plaintiff retained the RFC to occasionally lift ten pounds, frequently lift less than ten pounds, stand and walk two hours a day, and sit up to six hours a day. (Tr. 31.) Dr. Kim also noted the plaintiff's excruciating pain in her left hip and her inability to ambulate for more than a block. (Tr. 37.)

Based upon these reports, on December 6, 1995, a vocational consultant determined that "it appears that the claimant is capable of performing sedentary work activity. Due to these limitations, it does not appear that the claimant is capable of returning to her past work as a factory worker." (Tr. 47.)

The plaintiff again sought treatment from Dr. Shell in February 1996, at which time her chief complaint was increasing pain in her right hip, and she reported that she was "having pain on a daily basis and want[ed] something done." *Id.* A physical exam revealed limited motion in her right hip, and x-rays revealed severe arthritis with loss of joint space. *Id.*

The plaintiff had total right hip replacement surgery for right hip dysplasia on March 6, 1996. (Tr. 246-247A.). On March 11, 1996, she was discharged from the hospital with no post-operative complications. (Tr. 432.)

On September 19, 1996, the plaintiff was involved in a motor vehicle accident. (Tr. 395-396.) Within a few hours of this accident, she developed pain and stiffness in her neck, and a few days later, she developed lower back pain. (Tr. 428.)

7

On October 2, 1996, Dr. Daniel McHugh saw the plaintiff for her injuries sustained in the accident. (Tr. 428.) X-rays revealed anterior spurring at C6, no fractures on dislocation, and "mild decrease in cervical range of motion in all direction." *Id*. Dr. McHugh concluded that the plaintiff suffered from post-traumatic cervical and lumbar strains and suggested that she receive physical therapy and take Darvocet and 100 mg. of Disalcid twice daily. (Tr. 428.)

The plaintiff began physical therapy on October 9, 1996, for symptoms consistent with cervical, thoracic, and lumbar strain resulting from the accident. (Tr. 391.) At the time of her initial evaluation, the plaintiff rated her pain as 6 on a scale of 0-10, but she indicated that her level of pain had been at a 10 in the past week, and that the pain was constant, increasing with activity. (Tr. 391.) Physical therapist Barbara Bowen noted that the plaintiff was to receive "ultrasound and moist heat to her cervical and thoracic spine and moist heat and interferential current to her lumbar spine followed by dynamic stabilization exercise" three times a week for three weeks. (Tr. 392.) Because of her pain, the plaintiff was not able to attain active cervical range of motion. (Tr. 391.)

On October 21, 1996, the plaintiff saw Dr. McHugh again and he noted that her neck and back pain had improved "significantly." (Tr. 427.) Dr. McHugh also found a "mild decrease in cervical flexion in extension but full active range of motion otherwise throughout the [plaintiff's] neck and both upper limbs." *Id*.

On January 22, 1997, the plaintiff went to Dr. Robert Clendenin, an internal medicine and physical medicine rehabilitative specialist. (Tr. 425-454.)[4] Dr. Clendenin took a history from the plaintiff, noting a prior cervical disc laminectomy and recent numbness in the right arm, particularly the second and fourth fingers of the right hand. (Tr. 455.) A physical examination revealed negative spurlings maneuvers, "which are provocative maneuvers for a herniated disc or pinched nerve in her neck.*" Id*. Dr. Clendenin determined that the plaintiff "probably had a cervical radiculopathy, or

---

[4] The plaintiff had been seeing another doctor in Dr. Clendenin's practice before January 22, 1997. (Tr. 455.)

pinched nerve, in her neck." (Tr. 455.) An MRI indicated a "right-sided disc herniation at C6-7, which encroached, or narrowed, the C6-7 foramen in her opening

where the nerve root came out, on the right side." *Id.* Dr. Clendenin prescribed a Medrol dosepak. *Id.* On April 11, 1997, Dr. Clendenin prescribed Trilisate, an inflammatory analgesic, and Darvocet, and opined that the plaintiff could not lift more than twenty pounds. *Id.*

At some point between April and August of 1997, the plaintiff returned to work at Russell Stover Candies in Cookeville, Tennessee. (Tr. 378.) On August 27, 1997, the plaintiff presented to the emergency room at the Cookeville Regional Medical Center, where she was seen by Dr. James W. Cates, Jr. *Id.* She reported that she developed extreme pain the day before "over her right arm after she had lifted a piece of candy" at work, and that her pain continued and was aggravated by her lifting her arm. *Id.* According to Dr. Cates, her pain was the result of "one to two plus right paracervical muscle spasms with focal tenderness over the superior portion of the right scapula." *Id.* Dr. Cates diagnosed the plaintiff with acute exacerbation of bulging disc between C6 and C7, and advised her to schedule an appointment with Dr. Clendenin before returning to work. (Tr. 378-379.)

On September 5, 1997, Dr. Clendenin examined the plaintiff, noting that she had been doing "fine" until about four weeks prior when she began her assembly line job. (Tr. 423.) He determined that she was neurologically stable with no loss of sensation or strength, but that it would be in "her best interest" not to return to assembly line factory work. *Id.* Dr. Clendenin prescribed Disalcid, an anti-inflammatory, and Darvocet, and noted that, if her symptoms did not improve with rest, surgical intervention might be necessary. (Tr. 423, 455).

On February 9 and 13, 1998, Mark Loftis, a licensed psychological examiner, evaluated the plaintiff for participation in the Tennessee Vocational Rehabilitation program. (Tr. 342.) He administered the Weschler Adult Intelligence Scale-Revised ("WAIS-R") and the Woodcock Johnson Achievement ("WJ-R") tests and conducted a clinical interview. (Tr. 343.) The WAIS-R

yielded a verbal IQ of 82, a performance IQ of 82, and a full scale IQ of 81. *Id.* Mr. Loftis opined that the test results "may indicate" conceptual ability problems and deficits in memory and attention spans. (Tr. 344.) He also opined that it "appears" that the plaintiff "would meet the criteria for a disorder of written expression" and that her test results suggest the "possibility" of attention deficit disorder. (Tr. 345.)

On June 3, 1998, Dr. Donita Keown examined the plaintiff on behalf of the Tennessee Disability Determination Services ("DDS"). (Tr. 347-349.) Dr. Keown reported that the plaintiff "continues to complain of pain in the region of the hips in the left more so than the right," and that the plaintiff related that she had pain in her left hip 24 hours a day. Dr. Keown described the pain as "dull at baseline," becoming "sharp in character with walking." (Tr. 347.) Dr. Keown also noted that the plaintiff related that her neck pain is "present at all times" and "at times radiating into the occipital region causing headaches." *Id.*

Dr. Clendenin saw the plaintiff again on October 5, 1998. (Tr. 422.) He recorded that the plaintiff had a recent history of severe headaches, neck pain, and numbness down her left arm to her left hand. *Id.* Upon examination, she had decreased sensation globally in her left hand. Dr. Clendenin diagnosed her with cervical radiculopathy, and scheduled an MRI to rule out left-sided disc herniation. *Id.*

An MRI of the cervical spine revealed spondylotic change at several levels. (Tr. 419.) At C4-5, there was a right paracentral disc herniation, suggesting a chronic "hard disc," which results in "mild central canal stenosis at this level along with ventral flattening of the cord." *Id.* Neural foraminal narrowing was present on the left at C4-5 level and on the right at the C5-6 and C6-7 levels. *Id.*

In July of 2001, the plaintiff became a patient of Dr. Pushpendra K. Jain. (Tr. 595.) The plaintiff first saw Dr. Jain on July 11, 2001, for treatment of back pain, which radiated into the lateral aspect of her left leg. (Tr. 634.) Her symptoms were aggravated by prolonged standing and

10

sitting, and she complained of fatigue. *Id*. On July 30, 2001 (Tr. 636), September 11, 2001 (Tr. 638), and October 9, 2001 (Tr. 640), the plaintiff saw Dr. Jain for treatment of her back pain. On October 31, 2001, the plaintiff saw Dr. Jain as a result of what the plaintiff described as severe hip pain. (Tr. 642.)

On January 10, 2002, the plaintiff saw Dr. Jain again for back pain, which she described as "stabbing, shooting and burning," and radiating into her left leg. (Tr. 647.) Dr. Jain diagnosed the plaintiff with intervertebral disc disorder with myelopathy. *Id*. On January 23, 2002, the plaintiff returned to Dr. Jain with essentially the same complaints. On January 29, 2002, she reported a persistent pattern of pain and numbness in her back and hip (Tr. 649-650), and on February 28, 2002, the plaintiff saw Dr. Jain for continuing complaints of back pain. (Tr. 654.)

On March 21, 2002, Dr. Joseph Jestus, a neurosurgeon, examined the plaintiff. (Tr. 702-703). She again complained of a history of lower back pain with radiation into her thigh and lateral calf and into the bottom of her foot. *Id*. Dr. Jestus opined that the plaintiff suffered from right lower lumbar radiculopathy, "probably S1," but "may be L5." (Tr. 703.) Dr. Jestus noted that he would see the plaintiff again after an MRI. *Id.*

On April 15, 2002, Dr. Jestus performed L5/S1 hemilaminectomy and partial medial facetectomy and diskectomy in an effort to resolve the plaintiff's right leg pain. (Tr. 704-705.) Although the plaintiff tolerated the procedure well, her postoperative diagnosis was identical to her preoperative diagnosis, i.e., "[r]ight S1 radiculopathy secondary to right sided L5/S1 herniation." (Tr. 704.)

The plaintiff returned to Dr. Jain on June 25, 2002, continuing to complain of back pain. (Tr. 656). Dr. Jain again saw the plaintiff on July 9, 2002 (Tr. 657), on July 23, 2002 (Tr. 659), on August 22, 2002 (Tr. 661), on September 5, 2002 (Tr. 663), on November 7, 2002 (Tr. 668), on December 9, 2002 (Tr. 670), and he continued to treat her for her back pain through August 9, 2004.

11

At a deposition on November 2, 2004, Dr. Jain opined that the plaintiff suffered from a permanent disabling condition. (Tr. 597.)

Dr. Linda Blazina, a consultative psychologist, conducted testing on the plaintiff on April 22, 2007. (Tr. 864.) Dr. Blazina administered a Mental Status Evaluation, a Wide Range Achievement Test, and a WAIS. (Tr. 864-865.) The testing revealed a verbal IQ of 63, a performance IQ of 65, and a full scale IQ of 61. (Tr. 867- 868.) Dr. Blazina opined that, because of the plaintiff's "quite limited motivation," her scores slightly underestimated her intellectual function. (Tr. 868.) On the Wide Range Achievement Test, the plaintiff performed reading and arithmetic skills at the third grade level and spelling skills at the second grade level. *Id.* Dr. Blazina also noted that the plaintiff had symptoms of depression and would have difficulty understanding and remembering complex details and instructions due to her borderline intellectual function. (Tr. 869-870.) She diagnosed the plaintiff with dysthymic disorder, anxiety disorder and borderline intellectual functioning. (Tr. 869.)

On September 21, 2006, Dr. Horace Watson, a consultative physician, examined the plaintiff. (Tr. 841). He also indicated that he had reviewed "all the medical records that accompanied her," but did not indicate what medical records had "accompanied her." *Id.* According to Dr. Watson, the plaintiff's straight leg raising test was negative, and she had limited motion in both hips. There was no muscular atrophy or demonstrable weakness of her lower extremities. X-rays of her lumbosacral spine revealed moderate degenerative disc disease at the lumbosacral level. *Id.* Dr. Watson determined that the plaintiff could occasionally lift twenty (20) pounds and frequently lift ten (10) pounds. He also opined that the plaintiff could stand and walk at least two (2) hours in an eight-hour day, could sit up to six (6) hours a day, was limited in pushing or pulling in her lower extremities due to her chronic low back pain and bilateral hip joint pain, and, because of a discrepancy in her leg length, had limited motion in both hips. (Tr. 837-838.)

12

**B. Hearing Testimony**

Born March 15, 1957, the plaintiff was 50 years old at the date of her last administrative hearing. (Tr. 482.) Because of her learning disabilities, she was placed in special education and, because of her academic difficulties, she left school in the eighth grade. (Tr. 342-343.) During her childhood she was raped by a relative. (Tr. 102.)

For approximately ten years, the plaintiff worked at Cassemco, a local factory that manufactured military clothing and shoulder pads. (Tr. 487.) She has also worked as a dishwasher at a nursing home (Tr. 488-489), a milling machine operator at Crotty. (Tr. 489-491), and an assembler at Russell Stover Candies (Tr. 492). At one point she worked as a caregiver for children in the Families First Program. (Tr. 498.)

The plaintiff's most recent employment was during the years 2000 and 2005, when she worked on a limited basis between 21 to 28 hours a week as a waitress at the Waffle House in Cookeville. (Tr. 833, 888.) The plaintiff testified that, because of her pain, she stopped working at Waffle House for about three months but she had to return to work after her husband died in 2005. (Tr. 887-890.)[5] It appeared that the plaintiff was working at Waffle House at the time of her last hearing before the ALJ. (Tr. 887.) However, she explained that she had difficulty performing her job duties and relied on co-workers to assist her. (Tr. 890-893, 895.) The ALJ found that her employment at Waffle House could not be considered substantial gainful activity because her earnings were not sufficient. (Tr. 759.)

The plaintiff testified that she continues to experience problems with her hips, back, and neck, even after her surgeries. (Tr. 893-894.) She described the pain in her neck as "a pulling and

_____

[5] Her annual earnings from Waffle House were $7081.27 in 2000, and $8844.59 in 2001. In 2002, and 2003, her annual earnings were approximately $7440.00 in both years. However, her annual earnings decreased to $6893.22 in 2004, and to $6118.99, in 2005. Her statement of earnings, dated July 18, 2006, reflects that she had no earnings in 2006. (Tr. 833.)

13

burning sensation." (Tr. 894.) She related that her back hurts "like a knife sticking through it," that her hips hurt, and that her legs feel as if they "weigh about 100 pounds a piece sometimes." *Id*.

Marty Jay Roberts, one of the plaintiff's co-workers, testified that, while working with her for six years, he observed that she had "been unable to stand up on her feet for much longer than five minutes. And she can't sit down very long, either." (Tr. 897-898.) He also testified that she complained of discomfort and sometimes cried because of her pain, and that he and other co-workers "cover[ed] her tables" to help. (Tr. 898.) He described the plaintiff as a "good worker" when she was not in pain, which was about half of her shift. (Tr. 901-902.)

Jo Ann Bullard, the VE, testified that an individual of the plaintiff's age, education, past work experience, and a the RFC for a limited range of light work could perform the job of production assembler. (Tr. 905-906.) If her RFC were reduced to sedentary, the VE testified that the plaintiff could still perform the jobs of table worker fabrication, hand bander, and charge account clerk. (Tr. 906-907.)

### III. THE ALJ'S FINDINGS

The ALJ made the following findings:

1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2010.

2.   The claimant has not engaged in substantial gainful activity since August 19, 1996, the alleged onset date (20 CFR 404.1520(b), and 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

* * *

3.   The claimant has the following "severe" combination of impairments: degenerative disc disease of the cervical spine with a history of surgery on the herniated disc at the C6-7 level; a history of cervical radiculopathy before the claimant underwent surgery on the herniated disc in her cervical spine; a history of bilateral hip replacement surgeries; estimated borderline intelligence; a non-specified depressive

14

disorder; and a non-specified anxiety disorder (20 CFR 404.1520(c) and 416.920(c)).

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526, 416.920(d), 416.925 and 416.926).

* * *

5.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work except lifting/carrying is limited to 20 pounds on an "occasional" basis and 10 pounds on a "frequent" basis. She may stand/walk a total of 6 hours during an 8 hour workday. She may sit at least 6 hours during an 8 hour workday. She should avoid climbing ladders, ropes, and scaffolds. She can perform "occasional" climbing of ramps and stairs, stooping, crouching, crawling, kneeling, and balancing movements. She can perform "occasional" reaching overhead with either arm. She should refrain from working overhead more than 1/4 of an 8 hour workday. Her ability to understand and remember short, simple instructions does not appear to be impaired. She would likely have mild to moderate difficulty understanding and remembering complex and detailed instructions. Her social interaction and adaptation abilities are not impaired.

* * *

6.     Based on the claimant's established residual functional capacity, the impartial vocational expert who testified at the hearing indicated that the claimant could return to such past relevant jobs as a production assembler and cashier II, both of which are unskilled light exertional jobs. The claimant is unable to perform the other types of past relevant work (20 CFR 404.1565 and 416.965).

* * *

7.     The claimant was born on March 15, 1957, and was 39 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

15

8.    The claimant has an 8th grade, or "limited education" and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), and 404.1566, 416.960(c), and 416.966).

                              * * *

11.   The claimant has not been under a "disability," as defined in the Social Security Act, from August 19, 1996, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 759-765.)


# IV.  DISCUSSION

## A.  Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching his conclusion. 42 U.S.C. § 405(g). *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social Security cases). The Commissioner's decision must be affirmed if it is supported by substantial evidence, even if the evidence could also support another conclusion. *Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402

U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*). A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to support the ALJ's determination. 42 U.S.C.A. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), 404.1513(d). First, the plaintiff must show that she is not engaged in "substantial gainful activity" at the time she seeks disability benefits. *Id.* (citing 20 C.F.R. §§ 404.1520(b) and 416.920(b)). A plaintiff who is performing substantial gainful activity is not disabled no matter how severe the plaintiff's medical condition may be. *See, e.g., Dinkel v. Secretary of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

Second, the plaintiff must show that she suffers from a "severe impairment." A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.* (citing 20 C.F.R. §§ 404.1520 and 416.920). Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b). The Commissioner is required to consider the combined effects of

17

impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C. § 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, the plaintiff is presumed disabled without further inquiry, regardless of age, education or work experience. *Id.* (citing 20 C.F.R. §§ 404.1520(d) and 416.920(d)). The plaintiff may establish that she meets or equals a listed impairment, and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Secretary of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, she is not disabled. *Id.* The plaintiff has the burden of proving inability to perform past relevant work, or proving that a particular past job should not be considered relevant. *Smith v. Secretary of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, she must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that she is unable to perform her prior relevant employment, the burden shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment, and that such employment exists in the national economy. *See, e.g., Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). To rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs a plaintiff can perform. *See Kirk v. Secretary of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S. Ct. 2428, 77 L.Ed.2d 1315 (1983) (upholding the validity of the medical-vocational guidelines grid as a means for the Commissioner of carrying his burden under appropriate

18

circumstances). It remains the plaintiff's burden to prove the extent of her functional limitations. *Her*, 203 F.3d at 391. Even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the plaintiff can perform, she is not disabled.[9] *Id. See also Tyra v. Secretary of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Secretary of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

## B. Five Step Inquiry

The ALJ resolved the plaintiff's case at step four of the five-step process. (Tr. 763-764.) At step one, the ALJ determined that the plaintiff had not engaged in substantial gainful activity since her alleged onset date. (Tr. 759.) At step two, the ALJ found that the plaintiff has the following "severe" combination of impairments: degenerative disc disease of the cervical spine with a history of surgery on the herniated disc at the C6-7 level; a history of cervical radiculopathy before the claimant underwent surgery on the herniated disc in her cervical spine; a history of bilateral hip replacement surgeries; estimated borderline intelligence; a non-specified depressive disorder; and a non-specified anxiety disorder. (Tr. 760.) At step three, the ALJ determined that the plaintiff's impairments did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. *Id.* At step four, the ALJ found that the plaintiff could perform her past relevant work as a production assembler and cashier, which are both unskilled, light exertional jobs, but that she could not perform the other types of her past relevant work. (Tr. 764.) The ALJ also concluded that the plaintiff retained

the residual functional capacity to perform other jobs at the light exertional level that exist in the national economy in significant numbers. *Id.*[6]

**C. Plaintiff's Assertions of Error**

The gravamen of the plaintiff's complaint is that for years her case has been caught in a "revolving door between the administrative process and the court system" as the "Court keeps remanding the case back to the administrative level, and the Commissioner has yet to follow these instructions." Docket Entry No. 15, at 1-2. The plaintiff asserts that, most recently, when the ALJ failed to comply with the Appeals Council's remand order, the ALJ committed legal error. As a result, she argues that the Court should reverse the Commissioner's decision and remand this case to the Commissioner with instructions to certify payment of benefits to which she is entitled. Docket No. 15, at 25. In addition, the plaintiff contends that the ALJ did not properly weigh the medical records of Dr. P.K. Jain, the plaintiff's treating physician, that the plaintiff's orthopedic impairments meet or equal the Listings, that the plaintiff's orthopedic impairments meet the pain standard enunciated in *Duncan v. Sec'y of Health & Human Servs.,* 945 F.2d 1365, 1369-70 (6th Cir. 1991), and that the medical-vocational guidelines mandate a finding of disability.

Much of the defendant's response is puzzling. First, the defendant provides incorrect citations to the plaintiff's memorandum and to the Administrative Record. Second and more significantly, the defendant argues that the ALJ complied with the Sixth Circuit remand order. Docket Entry No. 24, at 6-8, and 12. As set forth above and as the plaintiff pointed out in her reply, this case has never been to the Sixth Circuit. The only remand orders have come from this Court and the Appeals Council.

---

[6]The ALJ's alternative finding was a step five determination. The ALJ explained that the plaintiff's limitations "impeded" her ability to perform "all or substantially all of the requirements" of a full range of light work. Therefore, he queried the VE about the existence of jobs in the national economy (which was a step five consideration) to determine the extent to which her limitations "erode[d] the unskilled light occupational base." (Tr. 764.)

In the Commissioner's first Section A,[7] entitled "The ALJ Complied With the Sixth Court of Appeals (sic) Remand Order," he takes word for word the argument made in the response to the plaintiff's motion for judgment on the record in *Gower v. Astrue,* 1-07-0043 (M.D. Tenn. Dec. 28, 2007) (Wiseman, J.) (Docket Entry No. 26, at 6-8), including what may be citations to the record in *Gower* rather than the instant case. The only difference between the section in this case and the *Gower* case was the slight variation in the caption of the section.[8] *See* Docket Entry No. 24, at 6.

The Commissioner argues, as he did in *Gower,* that the ALJ is entitled to determine the plaintiff's RFC anew upon remand, and that the ALJ is not bound to the RFC determined by the ALJ in a previous decision. In September of 1999, the ALJ found that the plaintiff had a RFC for a wide range of light work. Upon remand, the ALJ found in November of 2004, that the plaintiff had an RFC for sedentary work. Finally, in August of 2007, the ALJ found that the plaintiff retained an RFC to allow her to perform light work with some restrictions. The plaintiff has not, however, raised an issue about the changes in her RFC as addressed by the ALJs and has not questioned the scope of the ALJ's authority to reconsider the plaintiff's RFC except to the extent that she argues that the ALJ did not comply with the mandates of this Court and the Appeals Council.

There are also other portions of the defendant's memorandum that do not relate to the plaintiff. For instance, the defendant referred to "Dr. Prince's assessment," *see* Docket Entry No. 24, although the record does not reflect that the plaintiff ever went to Dr. Prince.[9] The plaintiff also points out that

---

[7]The defendant used two Section A's in its response. *See* Docket Entry No. 24, at 6 and 8.

[8]In *Gower,* the section was captioned "The ALJ Did Not Violate the Sixth Court of Appeals (sic) Remand Order."

[9]In addition, at one point in the defendant's brief, the defendant begins a sentence, "As mentioned above, the ALJ's failure to . . ." and concludes it with garbled words that appear to be "recognize overlooks the fact . . . . ," but it is not clear how the rest of the sentence or paragraph is intended to read. *See* Docket Entry No. 24, at 12.

21

the defendant represented that the plaintiff asserts that she meets Listing 14.09.  *See* Docket Entry

No. 24, at 6.  However, in the defendant's discussion, he properly refers to Listing 1.04.[10]  *Id.*  at 8.

Most curious is the fact that the plaintiff pointed out the defendant's errors in her reply (Docket

Entry No. 21), but the defendant did not attempt to correct or clarify his memorandum thereafter.[11]

Whether an ALJ complies with an Appeals Council order of remand is "an internal agency

matter which arises prior to the issuance of the agency's final decision."  *See Duda v. Sec'y of Health*

*and Human Servs.*, 834 F.2d 554, 555 (6th Cir. 1987).  Section 405(g) does not provide this Court with

authority to review intermediate agency decisions that occur during the administrative review process.

*Brown v. Comm'r of Soc. Sec.*, 2009 WL 465708, at *6 (W.D. Mich. Feb. 24, 2009)(quoting *Bass v.*

*Astrue*, 2008 WL 3413299, at *4 (M.D. N.C. Aug. 8, 2008) ("[t]he Court does not review internal,

agency-level proceedings, and therefore will not address whether the ALJ complied with specific

provisions of the Appeals Council's remand order.")).  Thus, a remand order from the Appeals Council

is not a final reviewable decision.  *See Duda,* 834 F.2d at 555.  Consequently, the Court lacks

jurisdiction to address whether the ALJ complied with the Appeals Council's remand order.  *See*

---

[10] It is not clear whether the plaintiff believes that the defendant "supp[lied] [a] boilerplate"
of Listing 14.09 or 1.04.  *See* Docket Entry No. 21, at 2.  However, the defendant quoted Section
1.00 of Part A of the Appendix 1 to Subpart P of Part 404 to the Listing of Impairments, which
clearly sets forth the criteria relating to Listing 1.04.  *See* Docket Entry No. 24, at 9.  To meet
Listing 1.04, the plaintiff must have a disorder of the spine or spinal cord with (1) "evidence of
nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion
of the spine, motor loss . . . accompanied by sensory or reflex loss and, if there is involvement of the
lower back positive straight-leg raising test;" or (2) spinal arachnoiditis, confirmed by medical tests,
"manifested by severe burning or painful dysesthesia, resulting in the need for changes in position
or posture more than once every 2 hours;" or (3) lumber spinal stenosis "resulting in
pseudoclaudication," confirmed by medical tests, and "manifested by chronic nonradicular pain and
weakness, and resulting in inability to ambulate effectively . . . ."

[11] As noted *supra* at n.1, the defendant's motion for summary judgment and accompanying
memorandum (Docket Entry Nos. 23-24) were deemed to be the defendant's response to the
plaintiff's motion for judgment on the record.  Because the defendant sought leave to make those
filings after the deadline had passed, the plaintiff's reply is docketed before the defendant's motion
and accompanying memorandum, deemed to be the defendant's response.

22

*Brown*, 2009 WL 465708, at *6 (dismissing claimant's appeal for lack of subject matter jurisdiction when claimant alleged ALJ erred in failing to follow directions of Appeals Council).

However, the Appeal Council's June 7, 2006, remand order essentially reiterated the this Court's March 30, 2006, order, reversing and remanding the case to the Commissioner for further review. Finding that "all essential factual issues had not been resolved," the Court remanded the case "in order for Defendant to (1) reevalute Dr. Jain's opinion and obtain additional medical information, if necessary; and (2) reevaluate and provide a comprehensive discussion of Plaintiff's credibility with reference to the administrative record." (Tr. 777.)

The record before the Court strongly suggests that the ALJ did not even attempt to comply with the mandate of the Court. The Court can only surmise that the ALJ did not read the Court's order since he announced at the very onset of the administrative rehearing that he was "[n]ot really sure why" the Court remanded her case. (Tr. 886.)[12] The ALJ's further pronouncement that the Court "didn't really state in [its] decisions" why the case was remanded is difficult to understand, given the explicit instructions set forth by the Court in a single order that was just over one page in length. *Id.* At no point in the twenty-two page transcript of the hearing did the ALJ read from or refer to the Court's order. (Tr. 886-908.)

By the Court's order, the ALJ was specifically instructed to reevalute Dr. Jain's opinion. (Tr. 777.) Even though the record contained reports of approximately 45 examinations conducted by Dr. Jain and his associates during the relevant period, the ALJ had previously rejected Dr. Jain's assessment and limitations on grounds that "Dr. Jain had not submitted treatment records to support his statements," "there is no evidence in the record to indicate the frequency of the claimant's doctor visits since the last decision," and "there is no evidence to show that she has been treated by any physician in the last five years." The ALJ's nine-page, single-spaced decision does not mention

---

[12]It is not clear why plaintiff's counsel did not address the 2006 remand order when the ALJ expressed his lack of understanding about why the case had been remanded at the beginning of the hearing.

Dr. Jain at all.  (Tr. 757-765.)   It does not explain how or why the ALJ failed to take into account Dr. Jain's voluminous treatment records, nor is it clear to the Court that these records were reviewed or considered prior to issuing a decision.

By the Court's order, the ALJ was also specifically instructed to reevaluate and provide a comprehensive discussion of the plaintiff's credibility with reference to the administrative record. (Tr. 777.)   The ALJ had previously determined that the plaintiff's testimony about her limitations were less than credible, without providing a rationale for that determination.  The ALJ did not fully comply with that portion of the order.  For example, the ALJ stated that "[t]he wide variety of daily activities the claimant reported she performs is also inconsistent with the degree of subjective complaints."  (Tr. 763.)  He then listed those daily activities, including sweeping, vacuuming, and cleaning the bathroom, that she allegedly performs.  However, the ALJ did not cite to the record nor did the plaintiff testify at her most recent administrative hearing that she performs these types of activities.

The Court finds that the ALJ's failure to comply with the Court's explicit instructions constitutes reversible legal error.  When "district courts 'include detailed instructions concerning the scope of the remand and the issues to be addressed' in a Social Security case '[d]eviation from the court's remand order in subsequent administrative proceedings is itself legal error, subject to reversal on further judicial review.'" *Drossman v. Comm'r of Soc. Sec.*, 2008 WL 1848202, at *6 (N.D. Ohio Apr. 17, 2008)(quoting *Hollins v. Massanari*, 2002 WL 31398968 (6th Cir. Oct. 17, 2002)).  *See also Sullivan v. Hudson,* 490 U.S. 877, 886, 109 S. Ct. 2248, 104 L.Ed.2d 941 (1989).

The general rule is that, on the remand of a case after appeal, "it is the duty of . . . the agency from which the appeal is taken, to comply with the mandate of the court and to obey the directions therein without variation and without departing from such directions . . . ."  *Mefford v. Gardner*, 383 F.2d 748, 758 (6th Cir. 1967).  In *Mefford,* the Sixth Circuit further explained that, "if the cause is remanded with specific directions, further proceedings in the . . . agency from which appeal is taken

24

must be in substantial compliance with such directions; and if the cause is remanded for a specified purpose, any proceedings inconsistent therewith is error . . . ." *Id.* (citation omitted.) *See also Brown v. Astrue*, 597 F. Supp.2d 691, 702 (N.D. Tex. 2009)("the Commissioner is obligated under mandate rule to implement both the letter and spirit of the court's order, and he is powerless to disregard the court's explicit directives.").

Here, the ALJ committed legal error by not following or substantially complying with the mandate of the Court. In *Gower v. Astrue*, 2008 WL 2852255 (M.D. Tenn. July 23, 2008) (Wiseman, J.), this Court determined that the ALJ had failed to comply with the Sixth Circuit's mandate, leaving, as Magistrate Judge Brown found in his Report and Recommendation, the Court with two options: remanding the case for further development by the ALJ or ordering an award of benefits. *Id.* at *3. Noting that the plaintiff filed his initial application over fourteen years earlier, Magistrate Judge Brown chose the latter option, after having determined that all essential factual issues had been resolved and the record adequately established the plaintiff's entitlement to benefits. *Id.*

In the instant case, as noted by this Court in 2002, and again in 2006, there are outstanding matters requiring further consideration in contrast to the circumstances in *Gower*. The record in this case has not been fully and fairly developed, and such a resolution could impact the plaintiff's other assignment of errors. Therefore, as much as the Court would like to conclude this matter, recognizing the time that has elapsed, an award of benefits at this time is inappropriate.

Therefore, this case should be remanded to the ALJ to ensure that the plaintiff finally receives full and fair consideration of her claim after pursuing benefits for over a decade. The ALJ is instructed to strictly comply with the instructions set forth in the Court's March 30, 2006, order. The plaintiff may or may not be entitled to an award of benefits, but she is entitled under the law to more than an ALJ's "best try" at resolving her claim.

25

## IV. RECOMMENDATION

For the above reasons, it is recommended that the plaintiff's motion for judgment on the administrative record be **GRANTED** to the extent that this case be **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) because the ALJ committed legal error in failing to comply with the mandate of this Court, and that the defendant's motion for summary judgment (Docket Entry No. 23) be **DENIED.**[13]

Any objections to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of service of this Report and Recommendation, and must state with particularity the specific portions of this Report and Recommendation to which the objection is made. Failure to file written objections within the specific time can be deemed a waiver of further appeal of the District Court's order. Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).

Respectfully Submitted,

JULIET GRIFFIN
United States Magistrate Judge

---

[13]Although the defendant's motion for summary judgment was deemed to be the response to the plaintiff's motion for judgment on the record, the defendant's motion is still listed as pending on the docket.

26